CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
3/31/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | | |
|---|---|---|
| TANAYSIA B., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:23-cv-00022 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LELAND DUDEK, | ) | By:  Hon. Thomas T. Cullen |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Tanaysia B. ("Tanaysia") filed suit in this court seeking review of the
Commissioner of Social Security's ("Commissioner") final decision denying her claim for
Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.
§§ 1381–1385.[1] Tanaysia suffers primarily from ADHD, obesity, some muscle weakness, and
coordination issues. On review of her application for SSI, an administrative law judge ("ALJ")
concluded that Tanaysia did not have an impairment or combination of impairments that
functionally equals any listing based on the six functional equivalence domains. She challenges
that conclusion, calling for reversal and summary judgment in her favor on the grounds that
the ALJ's opinion is not supported by substantial evidence in multiple respects. After a
thorough review of the record and the ALJ's opinion, the court concludes that the ALJ failed
to adequately explain his reasoning regarding the determinations of the functional equivalence

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Under Rule 25(d)
of the Federal Rules of Civil Procedure, Leland Dudek is substituted for Martin O'Malley as the defendant in
this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive
notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any
vacancy in such office.").

domains. Accordingly, because these analytical omissions frustrate the court's review, the court will remand this case to the Commissioner for further administrative proceedings consistent with this opinion.

## I.    STANDARD OF REVIEW

### A. Commissioner's Decision

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to social security benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is

disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Generally, a reviewing court will affirm the ALJ's findings when he has considered all the relevant evidence under the correct legal standards, and the written decision has built "an accurate and logical bridge from the evidence to [his] conclusions.'" *Arakas v. Comm'r. Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (internal quotation omitted).

**B. Childhood Disability Claims**

A person under the age of eighteen is "disabled," as that term is defined by the Act, if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). ALJs follow a three-step process to determine whether a child applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is engaged in substantial gainful activity; (2) has a severe medically determinable impairment; and (3) has an impairment or combination of impairments that meets, medically equals, or functionally equals the presumptively disabling childhood impairments listed in the Act's regulations. *Bryant v. Barnhart*, 63 F. App'x 90, 92–93 (4th Cir. 2003); 20 C.F.R. § 416.924(a).

If the ALJ finds that the applicant's severe impairment or combination of impairments does not meet or medically equal a specific listed impairment, then the ALJ must evaluate how appropriately, effectively, and independently the applicant functions in "six domains" when

- 3 -

compared to other children the same age "who do not have impairments." 20 C.F.R. §
416.926a. The six domains are: (1) acquiring and using information; (2) attending and
completing tasks; (3) interacting and relating with others; (4) moving about and manipulating
objects; (5) caring for oneself; and (6) health and physical well-being. *Id.* To functionally equal
the listings, the applicant's severe impairment or combination of impairments must cause
"marked limitations" in two domains or an "extreme limitation" in one domain.[2] The applicant
bears the burden of proving that she is disabled. *S.R. ex rel. R.R. v. Barnhart*, 371 F. Supp. 2d
796, 799 (W.D. Va. 2005).

When making findings regarding the functional equivalence domains, the ALJ will
evaluate the "whole child," including evaluating "how appropriately, effectively, and
independently the child functions compared to children of the same age who do not have
impairments." SSR 09-2P, 2009 WL 396032, at *1 (Feb. 18, 2009); 20 C.F.R. § 416.926a(b),
(c). An "ALJ should evaluate 'the kind, extent, and frequency of help or adaptations the child
needs,' the settings where the child has trouble, and 'all other factors'" when rating the severity
of a child's limitation in one of the domains. *Lakesha B. on behalf of N.A.R. v. Saul*, No. 4:19-
cv-00035, 2021 WL 372798, at *8 (W.D. Va. Feb. 3, 2021) (quoting SSR 09-1P, 2009 WL
396031, at *3).[3] Finally, there is no "set formula" for determining functional equivalence, and
determining "whether a child has 'marked' or 'extreme' limitations depends on the importance

---

[2] The term "marked limitation" means the applicant's "impairment(s) interferes seriously" with his or her
"ability to independently, sustain, or complete activities" in a particular functional domain. 20 C.F.R. §
416.926a(e)(2). An "extreme limitation" means the "impairment(s) interferes very seriously with [the
applicant's] ability to independently, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

[3] Although not available in an online reporter, the Report and Recommendation was adopted—without
objection by the Commissioner—on February 25, 2021. *See* Order, *Lakesha B. on behalf of N.A.R. v. Saul*, No.
4:19-cv-00035 (W.D. Va. Feb. 25, 2021) (ECF No. 22).

and frequency of the limited activities and the relative weight of all available evidence." *Id.* at
*9 (internal quotation omitted).

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Tanaysia filed her SSI application on April 18, 2013, alleging disability since February
1, 2013. (R. 229.) At the time of her application, Tanaysia was 7 years old, meaning that she
was a "school-age child" within the meaning of the applicable regulations.[4] (*See* R. 2391.) Her
application for benefits was denied initially and upon reconsideration, and Tanaysia requested
a hearing. (R. 309–11.) On March 27, 2015, ALJ R. Neely Owen issued a decision affirming
the determination that Tanaysia was not disabled. (R. 226–45.) Tanaysia appealed that decision,
and that appeal was denied by the Appeals Council on June 30, 2016. (R. 1–7.) On review of
the ALJ's decision, the district court entered an Order on December 14, 2017, remanding the
case to the Commission for further consideration. (R. 830–51.)

Tanaysia came before a second ALJ, Suzette Knight, who issued a decision on July 23,
2019, again denying her claim. (R. 692–725.) Tanaysia appealed that decision, and that appeal
was denied by the Appeals Council on October 8, 2020. (R. 685–691.) The district court
reviewed the ALJ's decision and again remanded the matter to the Commissioner for further
consideration. (R. 2426–32.) On April 6, 2023, after a hearing, ALJ Brian B. Rippel denied
Tanaysia's claim for a third time. (R. 2299.)

---

[4] At the time of the ALJ's decision in April 2023, Tanaysia was 17 years old—now categorized as an
"adolescent." (*See* R. 2303.)

## A. Medical Evidence

On March 21, 2013, Tanaysia was seen at the Children's Medical Center in Martinsville, Virginia, for a consultation for attention deficit and hyperactivity disorder ("ADHD") and attention deficit disorder ("ADD") maintenance. (R. 452.) At that visit, Dr. David Seamon assessed Tanaysia with chronic rhinitis and ADD without hyperactivity. (R. 453.) On May 1, Tanaysia had a follow-up with Dr. Seamon, during which he noted that she was "well behaved at school" and her "grades are getting better," but that she does not complete her homework unless someone monitors her. (R. 448.) As a result of his full examination, Dr. Seamon officially diagnosed Tanaysia with ADHD and morbid obesity. (R. 450.)

On August 5, Tanaysia had another follow-up with Dr. Seamon, during which he noted good grades and overall behavior but a "flat personality" and some trouble sleeping. (R. 475.) On October 7, Dr. Seamon noted Tanaysia's grades had fallen to "mostly low Cs" and that she had trouble behaving at home and was irritable. (R. 474.) Dr. Seamon maintained his diagnosis of ADHD. (R. 475) Another follow-up with Dr. Seamon on November 21 yielded the same assessments, but Dr. Seamon increased the dosage of Tanaysia's medication. (R. 471–72.)

On December 7, 2013, Tanaysia was seen at Triad Psychiatric and Counseling Center for ADHD treatment. (R. 479.) As a result of that appointment, Dr. Keshavpal Reddy prescribed Tanaysia Vyvanse and melatonin to treat her ADHD. (R. 481.)

On March 18, 2014, Tanaysia presented to Dr. Elizabeth Gillmore for a psychological assessment. (R. 618.) Dr. Gillmore noted that Tanaysia had current symptoms of hopelessness, depression, impaired concentration, and impaired functioning with work/school/family. (R.

621.) After a mental examination. Dr. Gillmore diagnosed Tanaysia with ADHD. (R. 623.)
Tanaysia saw Dr. Gillmore again on April 1, April 22, June 24, and July 1, 2014. During those
visits, Dr. Gillmore noted that Tanaysia had low grades, especially in reading (R. 624), had
some trouble sleeping (*see* R. 624, 626), and may have "low IQ or learning disabilities and
emotional problems including depression and anxiety" (R. 627).

On February 6, 2014, Tanaysia returned to Dr. Seamon for a routine follow-up to
manage her ADHD. (R. 503.) Dr. Seamon noted no major differences in her condition. (R.
503, 504.) Appointments on March 27, July 10, and September 9 yielded substantially similar
assessments. (R. 499–500, 615–16, 655–56.) During a December 9 appointment, Dr. Seamon
noted that Tanaysia's grades were "terrible" and that she had continuing symptoms of
irritability, anxiety, decreased self-esteem, and trouble sleeping. (R. 651.)

Starting in December 2014, Tanaysia regularly visited Piedmont Community Services
for treatment, including family therapy. (R. 631–35, 639–50, 659–79, 683–84.) On May 4, 2015,
Tanaysia presented to Piedmont Community Services for a medication management
appointment for her adjustment disorder with depressed mood and ADHD. (R. 1770.) Nurse
Practitioner Mary Davidson noted "some indication" of problems with attention and a
"problem with her pen grasp," for which she recommended an occupational therapy
consultation. (*Id.*)

On May 21, 2015, Tanaysia underwent an occupational therapy evaluation at the Center
for Pediatric Therapies – Martinsville. (R. 168.) Andrea Eanes conducted an assessment of
Tanaysia, including the Bruininks Osenetsky Test of Motor Proficiency (BOT-2), which
demonstrated below average scores for fine motor integration, fine motor precision, manual

dexterity, upper limb coordination, and bilateral coordination. (R. 170.) Eanes recommended occupational therapy once or twice a week for 30 to 60 minutes for 12 months. (R. 171.) Tanaysia continued occupational therapy with Center for Pediatric Therapies – Danville from June until January 2016. (*See* R. 131–65.) On May 24, 2016, Tanaysia met with Eanes who noted that Tanaysia had made sufficient progress in all areas and was appropriate for discharge from occupational therapy. (R. 1216.)

Tanaysia also continued to meet with Piedmont Community Services for case management and family therapy from April 2015 until March 2016. (*See* R. 10–80, 114–127, 174–225.) At one visit on November 9, NP Davidson noted Tanaysia's inability to pay attention and that she felt her concentration was "poor." (R. 36.) On April 11, Tanaysia again met with NP Davidson, who noted attention span and concentration were adequate, but that Tanaysia showed a lack of insight and judgment and a blunted affect. (R. 1364–66.)

On August 24, 2015, Tanaysia visited the Roanoke Child Development Clinic for an evaluation to determine whether she had a specific learning disorder. (R. 96.) At that visit, she saw Dr. Gregory Robinson, who administered the Differential Ability Scales, Second Edition (DSA-II) and Woodcock-Johnson IV Tests of Achievement (WJ-IV ACH). (R. 99.) In observing her during the tests, Dr. Robinson opined that Tanaysia was "generally focused" but "a bit restless at times and she needed occasional redirections." (R. 104.) Dr. Robinson noted that Tanaysia scored below average on most DAS-II scores and WJ-IV ACH scores. (*See id.*) Dr. Robinson concluded that the findings "were not consistent with the presence of a specific learning disorder," but that the results should be shared with her school in assist planning and instruction. (R. 104–05.)

On referral from Dr. Seamon, Tanaysia saw Dr. Begum-Hasan, a pediatric endocrinologist, in October 2015. (R. 1233.) Dr. Begum-Hasan recorded Tanaysia was 4'10" tall and weighed 152 pounds. (R. 1235.) Accordingly, he found that she "seem[ed] to have exogenous obesity due to unhealthy lifestyle," and recommended seeing a dietician and increasing physical activity. (*Id.*) A follow-up with Dr. Begum-Hasan on July 12, 2016, found Tanaysia to be clinically stable. (R. 1224.) At a well-check on May 23 and 24, 2016, Certified Pediatric Nurse practitioner Lea Lineberry also assessed that Tanaysia was not getting appropriate sleep or exercise (R. 1208) and diagnosed her with iron-deficiency anemia (R. 1200).

Tanaysia had follow-up appointments with NP Davidson on July 25, September 26, and October 31, 2016, all of which were unremarkable, with Tanaysia reporting continued struggles with concentration, anxiety, and frustration. (*See* R. 1399, 1401, 1421–23, 1437.) On November 28, NP Davidson found that Tanaysia's condition had improved, noting a normal attention span, concentration, mood, and thought process. (R. 1453–55.)

From October 24, 2016, until April 3, 2017, Tanaysia attended occupational therapy at Bassett Physical Therapy. (R. 1461–1535.) Notes from those visits indicated that Tanaysia did well and improved her handwriting and ability to dress herself. (*Id.*)

On February 2, 2017, Tanaysia presented to Dr. Mary Noonan for insomnia, anxiety, and ADHD. (R. 1595.) Dr. Noonan diagnosed her with ADHD and increased her Clonidine to help her sleep. (R. 1596.) A follow-up with Dr. Noonan on March 2 reported good progress with her medication regimen. (R. 1591–92.) Further follow-ups with Dr. Noonan on April 11 and May 2 found that Tanaysia had prediabetes, was overweight, and that she needed physical

therapy to address muscle weakness and developmental delays in motor function. (R. 1590, 1587.) A final follow-up with Dr. Noonan on June 1 was unremarkable, reporting only ADHD symptoms of impulsivity and an inability to complete tasks. (R. 1583.)

On July 10, 2017, Tanaysia saw Dr. Richard Claytor and Physician's Assistant Monica Wiltjer for an initial psychiatric assessment at Claytor Memorial Clinic. (R. 2260.) On July 31, Dr. Claytor found her attention and concentration to be "impaired although effort plays a role" and that her affect was somewhat restricted. (R. 2258.) Dr. Claytor diagnosed Tanaysia with ADHD, mood lability/anxiety, and disruptive behavior/insomnia. (*Id.*) Follow-ups with NP Wiltjer on August 31 and Dr. Claytor on October 9 yielded the same findings and diagnoses. (R. 2255, 2252.)

During this time, Tanaysia was also continuing physical and occupational therapy with Bassett Physical Therapy. In sessions between May 16 and October 6, 2017, Tanaysia showed significant increases in strength and coordination, but still needed some assistance. (R. 1555–76, 1667, 1649–1725.) Tanaysia continued physical therapy until December 29, 2017, when she was discharged to a home exercise program after meeting her goals. (R. 1969–2000.)

Tanaysia continued to follow-up with PA Witjer on January 11 and February 15, 2018. (R. 2249, 2246.) The clinical findings and diagnoses were unchanged during both visits. (R. 2249, 2246.) On April 19, 2018, Tanaysia presented to Dr. Claytor expressing a concern about a decrease in grades and her focus in school. (R. 2261.) Dr. Claytor's findings remained the same, but he changed her anxiety medication to Concerta after seeing little benefit from her previous medication—Strattera. (R. 2262.)

Tanaysia had additional check-ins with Dr. Claytor on July 12, September 4, and November 8, 2018. (R. 2264, 2267, 2270.) Dr. Claytor's findings were unchanged during these visits. (R. 2265, 2268, 2271.)

On January 21, 2019, Tanaysia had a routine appointment with Dr. Claytor, which was unremarkable. (R. 2273.) Tanaysia saw Dr. Claytor again on March 5, when her mother reported an increase in anxiety, agitation, and irritation when Tanaysia's medication wore off (as was a common complaint in the past). (R. 2276.) Dr. Claytor's findings were unchanged, but he increased her dosage of Celexa. (R. 2277.) On May 28, Tanaysia saw PA Wiltjer for an ongoing evaluation and follow-up. (R. 2681.) At that visit, her weight was 260 pounds, her mood was "happy," her thought content was clear, her thought process was tangential at times, and her attention span and concentration were "distracted." (R. 2681–82.) PA Wiltjer diagnosed Tanaysia with unspecified anxiety disorder, ADHD inattentive type, and mild single episode major depressive disorder. (R. 2681.) PA Wiltjer recommended that Tanaysia continue her Celexa, discontinue Concerta until returning to school, and improve her organizational and study skills to minimize the expression of ADHD in the future. (R. 2683.) Tanaysia saw PA Wiltjer for a follow-up on July 30, during which PA Wiltjer recorded the same findings and continued Tanaysia on her medications, including Concerta. (R. 2686–88.) Another follow-up on September 19 resulted in the same. (R. 2691–93.)

On October 31, 2019, Tanaysia saw CPNP Lineberry for a sick visit. (R. 2749.) Her examination was notable for a blood pressure of 151/100, a weight of 273 pounds, and several erythematous lesions between her legs. (R. 2749–50.) She was prescribed antibiotics and advised to return as needed. (R. 2750.)

During a follow-up with PA Wiltjer on December 10, PA Wiltjer continued to note that Tanaysia's attention span and concentration were "impaired albeit improved with effort" and her symptoms of ADHD, mood lability, anxiety, and disruptive behavior were still present but improved. (R. 2697.) PA Wiltjer's findings were unchanged during another appointment on March 31, 2020. (R. 2701–04.)

On April 21, 2020, Tanaysia saw CPNP Lineberry for a well-check. (R. 2733.) CPNP Lineberry recorded Tanaysia's blood pressure of 139/86 and weight of 274 pounds, but no other findings of significance. (R. 2734.) CPNP Lineberry assessed numerous conditions, including essential hypertension, prediabetes, ADHD, obesity, iron deficiency anemia, metabolic syndrome, unspecified sleep disorder, and underachievement in school. (R. 2735.)

Visits with PA Wiltjer on June 16 and September 17, 2020, were unremarkable, and her objective findings and diagnoses were unchanged. (R. 2706–09, 2726–29.) On December 15, 2020, Tanaysia saw PA Wiltjer again and reported that she was keeping up with her online school assignments, and her mother indicated that she was doing well. (R. 2711.) PA Wiltjer's assessment was unchanged, and she continued Tanaysia on her medications. (R. 2714.) Another follow-up with PA Wiltjer on March 18, 2021, recorded an increase in weight to 285 pounds, but otherwise unchanged mental evaluation and diagnoses. (R. 2716–19.)

On May 19, 2021, Tanaysia saw CPNP Lineberry for a well-check, where she reported that she was doing well in school but was having trouble sleeping, not following a balanced diet, and not involved in any activities at school or in the community. (R. 2737.) Her medical assessment was unchanged, and CPNP Lineberry reminded Tanaysia of the need to develop healthy habits. (R. 2739.)

On June 1, 2021, Tanaysia saw PA Wiltjer, reporting that she finished the school year "fairly well." (R. 2721.) PA Wiltjer's assessment remained unchanged, and she continued Tanaysia's medication regimen. (R. 2724.)

On July 9, Tanaysia saw CPNP Lineberry for an allergic reaction, during which CPNP Lineberry recorded her weight as 287 pounds. (R. 2758.) Tanaysia had another appointment with CPNP Lineberry on October 27 to discuss her anxiety and ADHD, and indicated she wanted CPNP Lineberry to manage her anxiety and ADHD care. (R. 2761.) On March 21, 2022, Tanaysia saw CPNP Lineberry for a follow-up on her ADHD. (R. 2766.) At that time, CPNP Lineberry indicated that Tanaysia's condition was well-controlled on her current medications. (*Id.*) Finally, on August 23, 2022, Tanaysia presented to CPNP Lineberry with a rash. (R. 2770.) CPNP Lineberry noted a weight of 272 pounds and lesions that were itchy at times. (R. 2770–71.) CPNP Lineberry diagnosed her with "rash and other nonspecific skin eruption" and discussed referring Tanaysia to a dermatologist if home care did not work. (R. 2771.)

On review of Tanaysia's case in a "Disability Determination Explanation" dated April 5, 2017, Dr. Leslie Elwood and Jo McClain, Psy.D., determined that Tanaysia's ADHD and depressive, bipolar, and related disorders are severe impairments but do not meet, medically equal, or functionally equal the requirements of a listed impairment. (R. 858.) Dr. McClain opined that Tanaysia's impairments caused a "less than marked" limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, but that she had "no limitation" in the domains of moving about and manipulating objects, caring for yourself, and health and physical well-being. (R. 859–60.)

On another review of Tanaysia's case in a "Disability Determination Explanation" dated November 9, 2017, Dr. Joseph Duckwall and Dr. Howard Leizer also determined that Tanaysia's ADHD and depressive, bipolar, and related disorders are severe impairments but do not meet, medically equal, or functionally equal the requirements of a listed impairment. (R. 874–75.) Both physicians found that Tanaysia had "no limitation" in the domains of moving about and manipulating objects and caring for yourself, but that she did have a "less than marked" limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. (R. 875–76.)

## B. Educational Evidence

In August 2013, Martinsville City Public Schools initiated a 504 evaluation process for Tanaysia on the basis of her ADHD and its effects on her learning, focus/attention, and concentration. (R. 484.) At the time, Tanaysia received accommodations, including getting extra time to complete assignments, using a planner to stay organized, having tests read aloud to her, and receiving assistance with homework. (R. 267, 484.)

On September 20, 2013, Tanaysia's 3rd grade teacher, Stephanie Boyd, completed a Teacher Questionnaire. (R. 395.) Ms. Boyd noted that she had been teaching Tanaysia for two months, that Tanaysia was below grade level in math and reading, and that she was on a 504 plan but not special education. (R. 388.) In her report, Ms. Boyd opined that Tanaysia was "weak in reading and math" and had a "slight problem" with activities such as expressing ideas in written form, refocusing, working without distraction, and working at a reasonable pace.

(R. 389–90.) She also noted that Tanaysia had "an obvious problem" with focusing long enough to finish a task and carrying out multi-step instructions. (R. 390.)

On August 6, 2014, Ms. Boyd completed another Questionnaire for Tanaysia. As to domain 1, Ms. Boyd reported that Tanaysia had "an obvious problem" with understanding school and content vocabulary, reading and comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. (R. 432.) She also noted "slight" problems with participating in class discussions, comprehending and doing math problems, and learning new material. (*Id.*) As to domain 2, Ms. Boyd reported that Tanaysia had a "serious problem" with focusing long enough to finish an assigned task, and an "obvious problem" with refocusing, carrying out multi-step instructions, and working at a reasonable pace. (R. 433.) As to domain 3, Ms. Boyd noted only "slight" problems with using appropriate language, interpreting body language, telling stories, and using adequate vocabulary to express ideas. (R. 434.) Ms. Boyd reported no problems in domains 4 and 5, and noted that Tanaysia has glasses and takes medication for ADHD in relation to domain 6. (R. 435–37.)

On October 30, 2017, Tanaysia's 7th grade English teacher, Melanie Rorer, completed a Teacher Questionnaire. (R. 1142.) Ms. Rorer reported that Tanaysia was reading at a 3rd grade level and writing at a 4th grade level. (R. 1135.) As to domain 1, Ms. Rorer noted an "obvious problem" with expressing ideas in written form and recalling and applying learned material, and a "slight problem" in other related activities. (R. 1136.) As to domain 2, Ms. Rorer noted that Tanaysia had an "obvious problem" with carrying out multi-step instructions, and a "slight problem" with completing other activities such as paying attention when spoken

- 15 -

to directly, focusing long enough to finish a task, refocusing, and working at a reasonable pace. (R. 1137.) Ms. Rorer reported no problems as to domain 3 or 4. (R. 1138–39.) As to domain 5 (caring for yourself), Ms. Rorer reported only a "slight problem" with responding appropriately to changes in own mood and knowing when to ask for help. (R. 1140.)

On May 20, 2019, Ms. Boyd completed another Teacher Questionnaire for Tanaysia—now as her 8th grade English teacher. (R. 2101, 2094.) Ms. Boyd reported that Tanaysia's reading and writing was on a 6th grade level. (R. 2094.) As to domain 1, Ms. Boyd noted an "obvious problem" with understanding school and content vocabulary and reading and comprehending written material. (R. 2095.) Ms. Boyd also noted a "slight problem" in areas such as learning new material and expressing ideas in written form. (*Id.*) As to domain 2, Ms. Boyd reported an "obvious problem" with carrying out multi-step instructions and a "slight problem" with focusing long enough to finish a task, refocusing, completing work adequately without careless mistakes, and working at a reasonable pace. (R. 2096.) Ms. Boyd reported no problems as to domains 3, 4, and 5, and noted only that Tanaysia wears glasses in domain 6. (R. 2097–2100.)

On June 5, 2019, Tanaysia's 8th grade Physical Science teacher, Chanda Prillaman, completed a Teacher Questionnaire. (R. 1174, 1181.) As to domain 1, Ms. Prillaman noted an "obvious problem" with comprehending and doing math problems, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (R. 1175.) She also noted a "slight problem" with comprehending oral instructions, reading and comprehending written material, understanding school and content vocabulary, participating in class discussions, providing organized oral explanations, and learning new material. (*Id.*) Ms.

Prillaman opined that Tanaysia needed assistance when working alone and was quick to give up without attempting the task assigned. (*Id.*) As to domain 2, Ms. Prillaman noted an "obvious problem" with carrying out multi-step instructions and completing work accurately without careless mistakes. (R. 1176.) Ms. Prillaman reported no problems as to domains 3, 4, and 5, and made no notes as to domain 6. (R. 1177–80.)

During the 2022 to 2023 academic year, Martinsville City Public Schools enacted an "Individual Accommodation Plan" for Tanaysia, which provided accommodations for her ADHD, including having tests read aloud, audio and small group testing, reading aloud to herself on SOL reading testing, and extended time to complete assignments. (R. 2634.)

On October 20, 2022, Tanaysia's 12th grade Chemistry teacher, John Allen, completed a Teacher Questionnaire. (R. 2637, 2644.) Mr. Allen reported that Tanaysia had no limitations as to domains 1, 2, 4, and 6. (R. 2638–39, 2641, 2643.) As to domain 3, Mr. Allen noted only a "slight problem" with expressing anger appropriately and respecting/obeying adults in authority (R. 2640.) As to domain 5, Mr. Allen noted only a "slight problem" with handling frustration appropriately and being patient when necessary. (R. 2642.) He also opined that Tanaysia was "very independent," and that she asked for help often "but not to an unusual degree for academic reasons." (*Id.*)

On October 24, 2022, Tanaysia's 12th grade Virginia/United States Government teacher, Keri Soqui, completed a Teacher Questionnaire. (R. 2645, 2652.) Ms. Soqui did not report any problems in domains 2, 3, 4, 5, and 6. (R. 2647–51.) As to domain 1, Ms. Soqui noted an "obvious problem" with understanding school and content vocabulary, reading and comprehending written material, recalling and applying previously learned information, and

applying problem-solving skills in class discussions. (R. 2646.) Ms. Soqui also noted a "slight problem" with understanding and participating in class discussions and learning new material. (*Id.*) Ms. Soqui opined that Tanaysia had difficulty completing assignments without help and struggled to make connections if questions and answers were not exactly worded as in her notes. (*Id.*)

On February 7, 2023, Tanaysia's 12th grade English teacher, Kathy Harned, completed a Teacher Questionnaire. (R. 2658, 2665.) Ms. Harned noted Tanaysia's reading level as "fair" (R. 2658) and stated that she sometimes needed extra time but has "very good grades," (R. 2659). Although she indicated a "slight problem" with some of the domain 1 activities, Ms. Harned reported no problems overall for any of the domains. (R. 2659–64.)

## C. Testimony

On February 18, 2015, Tanaysia and her mother, Jasmine Dandridge ("Ms. Dandridge") appeared for their first hearing before ALJ R. Neely Owen. (R. 229, 246–74.) During the hearing, Tanaysia stated that she was nine years old, in the fourth grade, and briefly described her experience at school and that she attended afterschool tutoring. (R. 254–62.)

Ms. Dandridge testified that Tanaysia was diagnosed with ADHD and was currently being treated with medication. (R. 263.) She also testified that Tanaysia was very emotional, had trouble concentrating on tasks, and was unwilling to do activities such as getting dressed by herself. (R. 263–64.) Regarding school, Ms. Dandridge noted that Tanaysia needed substantial help with her homework and attended special education classes for reading and math. (R. 265–66.) Additionally, Tanaysia had a 504 plan that included specific assistance strategies, such as having tests read aloud, and worked with a tutor outside of school for two

days every week. (R. 267.) Lastly, Ms. Dandridge described how Tanaysia could not sit down

to write a simple story, had trouble telling time or understanding money, and that she could

not read and comprehend a story book beyond a kindergarten or first grade level. (R. 272–73.)

On June 12, 2019, Tanaysia and her mother appeared for a second hearing, this time

before ALJ Suzette Knight. (R. 756.) At the hearing, her mother testified that Tanaysia

continued to have problems with her ADHD, including that she could not "complete task[s]"

and would "get irritated real fast." (R. 791.) She also noted that Tanaysia struggled with

completing her homework, especially if multiple assignments. (R. 792–93.) Ms. Dandridge

reported that Tanaysia received extra help at school to manage these issues, including extra

time on tests and assignments and having things read aloud to her. (R. 794.) Ms. Dandridge

told the ALJ that Tanaysaia mostly received "low Cs" on her latest report card, and that "she

does okay at the beginning" but "shuts down" when things get more challenging. (*Id.*)

When given tasks at home, Tanaysia would get overwhelmed, had difficulty

understanding instructions, and could not do more than one task at a time. (R. 795.) Ms.

Dandridge also testified that occupational therapy had not improved her fine motor skills, and

that Tanaysia still had trouble with coordination on tasks like eating, brushing her teeth, or

fixing her clothing. (R. 796–97.) Finally, Ms. Dandridge noted that Tanaysia still suffered from

depression and anxiety (R. 798), and that she was still immature for her age behaviorally (R.

799–800.)

On March 8, 2023, Tanaysia and her mother appeared for a third (and the most recent)

hearing before ALJ Brian Rippel. (R. 2350.) This time, Tanaysia testified on her own behalf.

She began her testimony by stating that she was in 12th grade and that she was still under a

504 plan to get accommodations at school. (R. 2360.) Under the plan, Tanaysia received extra time on assignments and tests and had tests read aloud to her. (R. 2360–61.) Tanaysia testified that she was still having "some" problems with her ADHD, including with focusing and concentration (R. 2362), and that she needed her mother's assistance with homework. (R. 2363). Additionally, Tanaysia stated that she would need reminders from her teachers or mother to complete tasks. (R. 2363–64.)

As to her physical limitations, Tanaysia testified that she still has "some" trouble with hand coordination and fine motor skills, especially when dealing with zippers or buttons (R. 2367) or when typing, because she doesn't "keep[her] hands in the proper position," (R. 2368). Finally, Tanaysia testified that she still had trouble with reading assignments, reading comprehension, writing assignments, and staying asleep at night. (R. 2371.)

Ms. Dandridge testified that Tanaysia continued to struggle with homework assignments and required assistance from her or her grandmother. (R. 2375.) Tanaysia would struggle to finish assignments out of frustration and inability to understand the material. (*Id.*) She also continued to have trouble with her reading and writing. (R. 2375–76.) As to her social behavior, Ms. Dandridge testified that Tanaysia spends most of her time in her room and does "not really" have any friends apart from her younger cousin. (R. 2377–78.) As to her physical conditions, Ms. Dandridge stated that occupational therapy has somewhat helped Tanaysia's handwriting, but that her hands are still weak. (R. 2381.) Additionally, she reported that Tanaysia weighs about 250 pounds, is 5'5", and is being treated for anemia. (R. 2382.)

**D. The ALJ's Opinion**

In the operative decision, the ALJ concluded that Tanaysia suffered from ADHD, anxiety disorder, depressive disorder, history of fine motor delay, hypertension, metabolic syndrome, obesity, and prediabetes, all of which qualified as severe impairments. (R. 2303.) But he found that Tanaysia did not suffer from "an impairment or combination of impairments" that met or medically equaled the severity of one of the listed impairments in the applicable regulations. (*Id.*) After considering "all of the relevant evidence" in his analysis of the six functional equivalence domains, the ALJ found that Tanaysia had: (1) less than a marked limitation in acquiring and using information; (2) less than a marked limitation in attending and completing tasks; (3) no limitation in interacting and relating with others; (4) less than a marked limitation in moving about and manipulating objects; (5) less than a marked limitation in the ability to care for herself; and (6) less than a marked limitation in health and physical well-being. (R. 2307.) As a result, the ALJ determined that Tanaysia was not disabled as of the date of her application—April 18, 2013. (R. 2337.)

### III.    ANALYSIS

Tanaysia presents two main arguments in support of remand: (1) that the ALJ's determination that she does not have an impairment or combination of impairments that functionally equal the listings is not supported by substantial evidence; and (2) that the ALJ's assessment of the testimonial allegations by Tanaysia and her mother is not supported by substantial evidence. In her first argument, Tanaysia specifically takes issue with the ALJ's analysis of domains 1, 2, and 4, arguing that his findings that she has only "less than a marked limitation" in domain 1 (acquiring and using information), domain 2 (attending and

completing tasks), and domain 4 (moving about and manipulating objects) are not supported by substantial evidence. (*See* Pl. Br. at 40.) The Commissioner contends that the ALJ provided a sufficient explanation, supported by substantial evidence, and that he built a logical bridge between the evidence and his findings. (*See* Def. Br. at 12, 14.) The court cannot agree with the Commissioner because it finds that it lacks the ability to conduct a meaningful review because of deficiencies in the ALJ's opinion.

"It is well established that although the court does not re-weigh the evidence considered by the ALJ or substitute its judgment for that of the ALJ, an ALJ must nevertheless provide an explanation for how he arrived at his conclusion." *Genean o/b/o Z.S. v. Dudek*, No. 4:23-CV-25, 2025 WL 644292, at *6 (W.D. Va. Feb. 27, 2025) (citing *Boulden v. O'Malley*, No. 24-1414, 2025 WL 48337, at *3 (4th Cir. 2025) (per curiam)). Accordingly, "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). "[T]he ALJ's logical explanation[] is just as important" to the court's review as the record evidence and the ALJ's conclusion. *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Crucially, "meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.* As for the functional equivalence domains specifically, "the ALJ's decision itself should 'provide sufficient detail' describing how he weighed [evidence of the child's limitations] so subsequent reviewers can understand why he made his findings." *Lakesha B. on behalf of N.A.R.*, 2021 WL 372798, at *9 (quoting SSR 09-1P, 2009 WL 396031, at *3).

In this case, the ALJ's decision does not satisfy that preliminary standard. Although the ALJ provided an extensive summary of the evidence in his 37-page opinion, the analysis of

the functional equivalence domains lacks a sufficient logical explanation to connect the relevant evidence in the record to his findings. For example, in domain 1 (acquiring and using information), the ALJ briefly recounted the evidence detailed in the first part of his opinion, but did not explain which details of that evidence he considered relevant in evaluating domain 1, how he considered different pieces of evidence, or how he concluded—based on the evidence he found to be relevant—that Tanaysia's impairments had only a "less than marked" limitation on her domain 1 functioning. (*See* R. 2330.) The ALJ cited to Tanaysia's testimony that she needed tests read aloud, that she re-took assignments as needed, and that she had difficulty reading her homework. (*Id.*) He also cited to testimony from Ms. Dandrige—her mother—that she had difficulties with reading and writing, had trouble delivering messages, could not repeat stories, tell jokes, or explain why she did things, "though she could read simple words, print some letters and her name, spell most 3-4 letter words, and know the days of the week and months of the year." (*Id.*) The ALJ also listed further evidence, including that her report cards showed average grades "even if she failed several standardized tests," that she "only had a 504 plan" with some accommodations, that state agency consultants had noted a less than marked limitation in this domain, that "multiple teachers noted largely slight limitation in this domain," and that Dr. Greenberg noted less than a marked limitation in this domain. (*Id.*)

But after that recitation, the ALJ summarily concluded: "thus, the undersigned finds less than marked limitation in the domain of 'acquiring and using information." (*Id.*) Absent from the ALJ's decision was any discussion of how he weighed these pieces of evidence in coming to his conclusion. Although prior sections of the opinion describe the persuasive

weight the ALJ ascribed to each piece of evidence as a general matter, the ALJ failed to explain how the evidence was relevant *as to this domain* or how different pieces of evidence fit together to support his conclusion. Consequently, the court is left to guess at how the ALJ actually considered the evidence or how he viewed any particular piece of evidence in relation to his domain 1 conclusion.

For example, the ALJ recounts some conflicting evidence as to domain 1. This evidence included that while Tanaysia "could not deliver phone messages, repeat stor[i]es she had heard, tell jokes, or explain why she did something," she could "read simple words, print some letters and her name, spell most 3–4 letter words, and know the days of the week and months of the year." (*Id.*) Similarly, the ALJ states that Tanaysia's "report cards throughout the period at issue show average grades that ranged form As to Cs, even if she failed several standardized tests." (*Id.*) But that amounts to no more than merely "listing evidence," and the ALJ jumped directly from this list of evidence to his conclusion that Tanaysia had a less than marked limitation in domain 1. *See Thomas*, 916 F.3d at 311. Accordingly, the court is left to guess, based on the lack of explanation, how the ALJ considered this conflicting evidence, which evidence most informed his opinion, and what reasoning connects the listed evidence to the conclusion.

With the ALJ's brief summary of the evidence in discussing domain 1, the court is also left to guess as to how (or whether) the ALJ considered the details of the teacher questionnaires in the record. As to all of these questionnaires collectively, the ALJ simply states that "multiple teachers noted largely slight limitation in this domain of functioning in their teacher questionnaires." (R. 2330.) This gives no insight into how the ALJ considered the

many details of those different questionnaires as they apply to domain 1 specifically. This is particularly true because the educational evidence relating to domain 1 contains conflicting accounts that must be reconciled through the ALJ's analysis. Because any such analysis is wholly absent, the court is left to guess at how the ALJ reconciled these discrepancies.

For example, although the ALJ noted that many teachers noted slight limitations in domain 1, many teachers also reported more severe, "obvious" limitations. (*See* R. 431, 1136, 2095, 2646). Additionally, the questionnaires contained notes of Tanaysia's poor reading, writing, and math grade-levels, which are relevant to her domain 1 limitations. (*See* R. 431, 1135, 2094, 2325.) Finally, although the ALJ is not required to cite to every single piece of evidence in the record, it seems that he also failed to address the questionnaire by Ms. Prillaman, both in his analysis of domain 1 and in the general discussion of the evidence. Because Ms. Prillaman's report supports finding limitations in this domain—including noted "obvious" limitations—and weighs against the ALJ's findings (*see* R. 1175), this omission further obfuscates how and whether the ALJ weighed inconsistent evidence in reaching his conclusion. This lack of explanation warrants remand.

Accordingly, the court's meaningful review is frustrated by the lack of analysis between the summarized evidence and the ALJ's bare-bones conclusions in some of the functional domains. The court appreciates the ALJ's thorough recitation of the evidence, but its review is frustrated by the ALJ's failure to provide a reasoned explanation of how this evidence supports his conclusions or how he reconciled the conflicting evidence. The ALJ must provide a more thorough analysis of how that evidence is considered and applied in the specific domains. Therefore, the court finds that the ALJ failed to build the necessary "logical bridge"

from the evidence to his conclusion that Tanaysia has a less than marked limitation in domain 1. Because this failure alone requires remand, the court will not address Tanaysia's remaining arguments.[5]

## IV.   CONCLUSION

For the foregoing reasons, the ALJ failed to comply with important standards in explaining his decision. Those failures frustrate the court's review and, accordingly, this case must be remanded to the Commissioner for further proceedings consistent with this opinion. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Therefore, Tanaysia's motion for summary judgment will be granted and the matter remanded.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 31st day of March, 2025.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[5] The court's decision not to address the remaining grounds Tanaysia raises in her appeal of the ALJ's decision does not reflect any judgment on the merits of those challenges. The ALJ should consider the veracity of those challenges on remand as well, in light of this opinion, and Tanaysia is not barred from reasserting those challenges in future proceedings.